**UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF VIRGINIA**
**NORFOLK DIVISION**

SOUTHERN TRUST MORTGAGE, LLC

        *Plaintiff,*

   v.

GRACE WHITE and MOVEMENT
MORTGAGE, LLC

        *Defendants.*

        :

Civil Action No. _____

## COMPLAINT

Plaintiff Southern Trust Mortgage, LLC ("Southern Trust" or the "Company"), by and through its undersigned counsel, hereby files this Complaint seeking monetary damages and such other relief as the Court deems appropriate against Defendants Grace White ("White") and Movement Mortgage, LLC ("Movement," collectively, "Defendants"), and in support therefore avers as follows:

## PRELIMINARY STATEMENT

1.    Southern Trust brings this action because White solicited Southern Trust customers to move their business to Movement while she was still employed by Southern Trust. White did this with the full collaboration of Movement's Market Leader, Reggie Register.

2.    Concurrently, White stuffed a thumb drive full of thousands of confidential Southern Trust documents so that she would have them when she started work officially with Movement. The thumb drive includes: (a) information on loan programs; (b) training materials; (c) Southern Trust's custom forms, and (d) data concerning Southern Trust's current customers

1

and customer leads. White even took screen shots of information to bypass the security restrictions Southern Trust implemented to restrict access to its confidential information.

3.     Adding insult to injury, White has started work for Movement less than five miles away from where she worked for Southern Trust, performing the same work that she did for Southern Trust.  As such, she is violating the Confidentiality Agreement she entered into with Southern Trust.

4.     White's misconduct has injured Southern Trust.  Having already lost business as a result of Defendants' actions and faced with greater injuries, Southern Trust is now forced to seek appropriate monetary damages against her.

## THE PARTIES

5.     Plaintiff Southern Trust is a Virginia Limited Liability Company with its principal place of business at 295 Bendix Road, Suite 400, Virginia Beach, Virginia 23452.

6.     Defendant Grace White is an adult individual who currently resides at 311 37th Street, Norfolk, Virginia 23508.

7.     Defendant Movement Mortgage, LLC is a Delaware limited liability corporation with a principal place of business at 8024 Calvin Hall Road, Indian Land, South Carolina 29707. Movement maintains offices in Virginia and is registered to and transacts business within the Commonwealth of Virginia.

## JURISDICTION AND VENUE

8.     This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 and 18 U.S.C. § 1836(c) because this action arises under the Defend Trade Secrets Act, 18 U.S.C. § 1831 et seq., as well as supplemental jurisdiction over Southern Trust's state law causes of action under 28 U.S.C. § 1367.

9.      The Court has personal jurisdiction over Defendant White because she is a resident of Virginia. This Court has personal jurisdiction over Defendant Movement because Movement regularly conducts business within this jurisdiction and employs Defendant White, who lives and works in this jurisdiction.

10.     Venue is proper in the United States District Court for the Eastern District of Virginia pursuant to 28 U.S.C. § 1391(b).

11.     Additionally, Southern Trust and White executed a Loan Officer Employment Agreement (the "Employment Agreement"), which provides in Section 9.13, "[w]ith respect to any controversy, argument or claim arising out of or relating to this Agreement, or any breach thereof (including, but not limited to, a request for emergency relief) or any tort claim among the parties, the parties hereby consent to the sole and exclusive jurisdiction and venue of the Circuit Courts of the Cities of Virginia Beach and Norfolk, Virginia and the U.S. District Court for the Eastern District of Virginia, Norfolk Division…" A true and correct copy of the Employment Agreement is attached hereto as **Exhibit A**. Similarly, Southern Trust and White executed a Confidentiality and Restrictive Covenant Agreement (the "Confidentiality Agreement"), which also set the choice of forum or venue "[w]ith respect to any controversy, argument or claim arising out of or relating to this Agreement, or any breach thereof or any tort claim among the parties, the parties hereby consent to the exclusive jurisdiction, venue and forum of the Circuit Court of the City of Norfolk or Virginia Beach, Virginia and the U.S. District Court in the Eastern District of Virginia, Norfolk Division…" A true and correct copy of the Confidentiality Agreement is attached hereto as **Exhibit B**.

**Factual Allegations**

**A. Southern Trust**

12.    Southern Trust was founded in 1997 and operates as a provider of real estate financing solutions, offering its customers a variety of mortgage products. Southern Trust is currently licensed to provide mortgage lending services to clients in twelve (12) states.

13.    Southern Trust expends a significant amount of time and resources to develop its brand and market itself to potential borrowers, prospective employees, and employees. It has taken Southern Trust years to build up its formidable reputation which Southern Trust uses to generate revenue.

14.    As a mortgage lender, Southern Trust obtains and stores substantial amounts of nonpublic, sensitive customer information, including, but not limited to, names, address, employment information, social security numbers, salary information, credit information, credit card and bank account numbers, assets, liabilities, loan approval, loan status and loan denial, credit scores, account balances and other financial information (collectively "Confidential Information"), to help provide mortgage lending services to its customers.

15.    Southern Trust also derives independent economic value from its prospective and current customer lists, loan applications, loan product offerings, pricing information, and communications with clients.

16.    Southern Trust develops its prospective and current customer lists by expending significant resources on compiling and maintaining them.

17.    As such, prospective and current customer lists, loan applications, loan product offerings, pricing information, and communications with clients constitute trade secrets.

18.    Southern Trust entrusts its Loan Officers company-wide with trade secret information in the performance of their jobs as Loan Officers.

19.     To ensure the protection of Southern Trust's confidential and proprietary information, Southern Trust takes several steps to maintain the privacy of its data and information. For instance, Southern Trust's email and loan operating systems are password protected and encrypted, and in order for employees to access the systems, a Technical Administrator of Southern Trust's IT Department has to provide permission.[1] Southern Trust's system also has user level permissions, which require access by a Technical Administrator of Southern Trust's IT Department. Finally, Southern Trust uses two-factor authentication, which provided a second layer of protection to their system.

20.     Southern Trust also requires some of its Loan Officers to sign Confidentiality Agreements to prevent the unauthorized disclosure and/or use of its Confidential Information and its trade secrets, and issues cease and desist letters or engages in litigation to enforce these agreements.

**B.     Defendant White's Employment with Southern Trust**

21.     On or about February 15, 2022, White began her employment with Southern Trust as a Loan Officer ("LO") with its Virginia Beach, Virginia location, which is also corporate headquarters. At all relevant times, White worked at the Virginia Beach location.

22.     As a material term and as consideration for employment with Southern Trust, on February 15, 2022, Southern Trust and White executed the Employment Agreement and the Confidentiality Agreement. *See* Exhibits A and B.

---

[1]As a financial institution Southern Trust also complies with the Gramm-Leach-Bliley Act ("GLBA") and federal regulations promulgated thereunder. Southern Trust has implemented these same policies to safeguard and secure its information and that of its valued customers.

23.     In relevant part, the Employment Agreement specifies that during employment with Southern Trust, White was required to "comply with all duties and requirements imposed on Loan Officer, as set forth in the company policies." *See*, Exhibit A Article II 2.1 (b).

24.     The Employment Agreement also provides that:

> While employed by [Southern Trust], the Loan Officer shall assist and work for only [Southern Trust] and no other employer, lender, broker, or other entity, and shall not engage in any way in any mortgage lending or brokering, loan processing or underwriting services…or other business or service of the same or similar nature, unless approved by [Southern Trust] in writing.

*See,* Exhibit A, Art. II 2.1(c).

25.     The Employment Agreement further provides that:

> Simultaneous with the execution of this Agreement, Loan Officer shall enter into a separate Confidentiality and Restrictive Covenant Agreement, a copy of which is attached hereto as Appendix B.

*See,* Exhibit A, Art. VIII 8.1 (emphasis in original).

26.     White signed the Confidentiality Agreement and acknowledged that, as a part of her employment as a Loan Officer, she would be privy to Confidential Information, and that Southern Trust "wish[ed] to obtain reasonable protection of its Confidential Information which it has developed, acquired and/or is or may be developed or acquired by the Company at substantial expense." *See* Exhibit B, Preamble.

27.     The Confidentiality Agreement sets forth in relevant part that "Confidential Information" shall mean:

> any information which is disclosed by Company to Loan Officer or developed or obtained by Loan Officer while employed in connection with Loan Officer's job responsibilities in any form, manner or media unless excluded below. All information related orally shall be understood to be included in the category of Confidential Information unless specifically identified as being non confidential. Confidential Information shall include, but is not

6

> limited to, information regarding customers, employees, referral sources, financial, business and marketing strategies, business ideas, pricing, trade secrets, records, files, plans, and documents, the process developed and used by Company for training employees and any other Company information.

*See* Exhibit B, ¶ 2.

28. The Confidentiality Agreement also contains the following restrictive covenant provisions, aptly titled: (1) Covenant Not to Divulge Company Confidential Information; (2) Non-Solicitation of Employees Covenant; (3) Non-Solicitation of Customers Covenant; (4) Non-Solicitation of Potential Customers Covenant; and (5) Non-Compete. *Id.* at ¶¶ 3, 5-8.

29. Specifically, the Covenant Not Divulge Company Confidential Information sets forth:

> Loan Officer acknowledges and agrees that Company is entitled to prevent the disclosure of Company Confidential Information. Loan Officer agrees at all times during the term of this Agreement and during the Confidentiality Period (defined below) to hold in strictest confidence and not to disclose to any person, firm or entity, other than to Company's officers, directors, or other authorized representatives, and not to use or allow others to use it except in the support of the business of the Company, any Confidential Information, without the prior written consent of the Company, unless such disclosure is required by subpoena, in which case Loan Officer shall give reasonable prior written notice thereof to the Company and provide the Company with the opportunity to contest such disclosure. For the purposes of this Agreement, the "Confidentiality Period" shall mean (i) as to confidential information that does not constitute a trade secret under applicable law, for a period of five (5) years following termination of Loan Officer's employment with the Company at any time and for any reason, or (ii) as to confidential information that constitutes a trade secret under applicable law, for so long as such confidential information constitutes a trade secret.

*See* Exhibit B at ¶ 3.

30. In fact, when she signed the Confidentiality Agreement, White acknowledged and agreed that: "(a) all documents, agreements, plans, specifications, forms, notes, reports,

memoranda, studies, data, calculations, compilations of information, records, files (including electronic), manuals, contacts, price lists, vendor lists, forms, letters, e-mails or other materials generated (whether by Company, Loan Officer or other Loan Officers of Company)…" were Southern Trust's property to be used by White "solely in connection with the performance of Loan Officer's services to or on behalf of Company hereunder and for its sole and exclusive benefit." *Id.* at ¶ 4.

31.    White also agreed to "promptly return" all of the Company's Confidential Information upon the end of her employment with Southern Trust or upon Southern Trust's request. *Id.*

32.    In addition to the foregoing, the one (1) year non-solicitation and noncompete provisions provides, in pertinent part:

> <u>Non-Solicitation of Employees Covenant</u>. The Loan Officer specifically agrees that during the Loan Officer's employment with the Company and for a period of twelve (12) months after Loan Officer's employment with the Company ceases, for whatever reason, Loan Officer shall not, on Loan Officer's own behalf or on behalf of any other person or entity, solicit or hire or assist in soliciting or hiring for employment that is competitive to Company any other employee that worked for Company at any time during the six (6) month period prior to Loan Officer's cessation of employment with Company.

*See* Exhibit B at ¶ 5.

> <u>Non-Solicitation of Customers Covenant</u>. The Loan Officer specifically agrees that during the Loan Officer's employment with the Company and for a period of twelve (12) months after Loan Officer's employment with the Company ceases, for whatever reason, with or without cause, and voluntarily or involuntarily, Loan Officer shall not on Loan Officer's own behalf or on behalf of any other person or entity, solicit or assist in soliciting Competitive Business from a Restricted Customer.

*See* Exhibit B at ¶ 6.

> Non-Solicitation of Potential Customers Covenant. The Loan Officer specifically agrees that during the Loan Officer's employment with the Company and for a period of twelve (12) months after Loan Officer's employment with the Company ceases, for whatever reason, with or without cause, Loan Officer shall not on Loan Officer's own behalf or on behalf of any other person or entity, solicit or assist in soliciting Competitive Business from a Restricted Potential Customer. For purposes of this Paragraph 7, "Competitive Business" shall mean the provision of products and/or services competitive with the products and/or services provided by Loan Officer on behalf of Company when the Loan Officer's employment ended.

*See* Exhibit B at ¶ 7.

> Non-Compete. During Loan Officer's employment under this Agreement and for a period of twelve (12) months following the cessation of Loan Officer's employment for whatever reason, with or without cause, Loan Officer shall not, on Loan Officer's own behalf or on behalf of any other person or entity, compete with Company in the Restricted Area by engaging, in a competitive capacity, in any Competitive Business.

*See,* Exhibit B at ¶ 8.

33. The Confidentiality Agreement defines "Competitive Business" as "the provision of products and/or services competitive with products and/or services provided by Loan Officer on behalf of Company when Loan Officer's employment with Company end." *See,* Exhibit B at ¶¶ 6, 7, 8.

34. "Restricted Area" is defined as a 25-mile radius from any office where Loan Officer worked [on behalf] of Company within twelve (12) months prior to cessation of employment…" *Id.* Southern Trust's Virginia Beach office at which White was based throughout her employment is located at 295 Bendix Road, Suite 400, Virginia Beach, VA 23452.

35. For purposes of Paragraph 6, "Restricted Customer" means any person or entity who or which was a customer of Company at any time during Loan Officer's final twelve (12) months of employment to whom Loan Officer provided Company products or services. *Id.* at ¶ 6.

9

36.     For purposes of this Paragraph 7, "Restricted Potential Customer" means any person or entity with whom Loan Officer had contact in connection with prospective business for Company at any time during Loan Officer's final twelve (12) months of employment." *Id.* at ¶ 7.

37.     The Confidentiality Agreement also contains a remedial provision, which provides for injunctive relief as follows:

> Injunction. The Loan Officer acknowledges that a violation on Loan Officer's part of any restrictive covenants in Paragraphs 3, 5, 6, 7, 8 and 10 of this Agreement will cause such damage to Company as will be irreparable and the exact amount of which will be impossible to ascertain, and for that reason, the Loan Officer further acknowledges that Company shall be entitled, as a matter of course, to an injunction out of any Court of competent jurisdiction, restraining any further violation of the covenant by the Loan Officer, and, pending the hearing and decision on the application for such injunction, Company shall be entitled to a Temporary Restraining Order, and waives any request for a bond, or the equivalent thereof, without prejudice to any other remedies available to it. The Loan Officer particularly agrees to the immediate issuance of such Temporary Restraining Order and hereby waives any requirements of notice or objection whatsoever to the issuance of such an Order.

*See,* Exhibit B at para 9.

38.     Both the Employment and Confidentiality Agreements are governed by Virginia law. *See,* Exhibit A, Art. IX 9.10; Exhibit B, ¶ 20.

39.     In addition to executing the above Agreements and as part of her employment with Southern Trust, White joined Southern Trust to work on a team with one of the Company's most senior and success Loan Officers as part of Southern Trust's "Green LO" program (the "Program").

40.     Southern Trust's Program is unique to Southern Trust and designed as a rigorous training course for individuals with little to no prior mortgage experience such as White. In fact,

10

most companies in the mortgage industry do not hire individuals who have no experience in this field. The Program is exclusive to Southern Trust and acceptance into the Program is competitive.

41.    Southern Trust took a chance on White by allowing her to enroll and participate in its exclusive and illustrious Program. Indeed, every Loan Officer who takes the training course is required to sign the Confidentiality Agreement to protect the valuable trade secrets and training provided to employees at a significant cost to Southern Trust. Notably, those in the Company who do not take this training and/or are not new Loan Officers are not required to sign a noncompete.

42.    Each week, Southern Trust devotes significant resources by providing high-level coaching and mentoring to develop successful Loan Officers to work on behalf of the Company. This includes not only instruction but live coaching critique and evaluation of actual interactions with realtors and potential borrowers.

43.    For example, the Program provided hands on training by placing White in real-life scenarios as a Loan Officer. White would conduct cold calls to realtors and Southern Trust would provide constructive criticism as to those calls and assist with business development.

44.    The Program provided White with the requisite skills and leadership training to be successful a Loan Officer. For instance, the Program entailed guest speakers and a healthy marketing budget provided at significant cost to Southern Trust.

45.    The Program also included information on developing business as a Loan Officer, including, but not limited to, Agent/Customer Relationships, Building Business Referral Partners, Sales Training and Marketing Strategies in the form of social media and digital advertising. Southern Trust implemented these techniques to ensure successful growth as a Loan Officer.

46.     The Program included information on navigating the nuances in the mortgage industry, including types of loans, how loans impact individuals, the approval process, developing relationships and market business.

47.     Southern Trust also provided White with written materials explaining how a loan is made, the various types of products available, how to maintain the business by focusing on customers, and fostering relationships with realtors. Further, Southern Trust educated White on the complex rules, regulations, and compliance issues within the mortgage industry. Southern Trust, through its exclusive and specialized Program, provided White with the essential tools to succeed as a Loan Officer within the mortgage industry.

48.     The tools the Program provided by way of guest speakers, homework, and knowledge allowed White to develop a unique set of abilities consisting of analyzing complex financial data, resolving issues that arise throughout the application process, developing analytical skills and marketing techniques, and building positive relationships with clients. Each of these elements was included after extensive research, development, experimentation and trial and error, at a substantial cost of time and money to the Company.

49.     Moreover, and as part of White's participation in the Program, Southern Trust paid the costs associated with White obtaining her LO license through NMLS as well as subsequent yearly licensing renewals.

50.     In addition to the Program training materials, White had access to a full-time trainer and support point of contact, while also enjoying the benefits of working directly with a senior Loan Originator with two decades of experience. Each of these individuals provided ongoing support by way of fostering relationships with realtors and customers in relation to Loan Originator duties and responsibilities on an as needed basis to White. Once White started producing loans,

12

she was given a point of contact at each step in the loan approval process so that there would be additional individuals with experience to help her on every step of the loan approval process.

51.     In her role as a Loan Officer, White was highly trusted in her position and showing a steady increase in volume and compensation. Southern Trust expected her to assist a borrower throughout the home-buying process, analyze financial information, submit applications, and monitor a borrower's overall process. Further, White was expected to (and indeed did) build a supportive referral network with clients and real estate agents.

52.     In furtherance of completing the Program, White established herself as a valuable Loan Officer in her employ with Southern Trust. In fact, White experienced such remarkable success through this Program that her loan volume steadily increased every year. White worked on a team with one of Southern Trust's top salespeople who, year to date, has closed $34,000,000 in loans. From her start date in 2022 until her last day, White closed seventy-six (76) loans for $13,200,000 in volume, representing approximately $374,668 in gross revenue for Southern Trust.

53.     But for White having signed the Employment Agreement and Confidentiality Agreement, including the nondisclosure, non-solicitation and non-competition covenants, Southern Trust would not have spent tens of thousands of dollars and hundreds of man hours on her, nor would it have taken the risk of training an inexperienced Loan Officer by putting her through its proprietary training.  It would not have trusted her to establish relationships with realtors, act as the point contact for such relationships, and continue to foster those relationships.

**C.  Defendant White's Violations of Her Employment and Confidentiality Agreements**

54.     White has violated the Employment and Confidentiality Agreements in several ways: (1) by accepting competitive employment with Movement in violation of her noncompete; (2) by diverting loans and soliciting Southern Trust's customers and potential customers to

Movement while still working for Southern Trust, in violation of her fiduciary duties, the Employment Agreement, and the Confidentiality Agreement; (3) by soliciting Southern Trust's customers after her employment ended, in violation of the Confidentiality Agreement; and (4) upon information and belief, downloading and retaining Southern Trust's Confidential Information and trade secrets in violation of her obligations under the Confidentiality Agreement, and subsequently disclosing this information to agents of Movement to intentionally and maliciously interfere with Southern Trust's ongoing relationships with current and prospective customers.

### *White's Employment With Movement Violates the Non-Compete Provision*

55.     On or about October 16, 2024, White abruptly resigned her employment to work for Southern Trust's direct competitor, Movement, as a Loan Officer – the same position she held at Southern Trust. Below is a screen shot of White's profile page on Movement's website:



**Grace White**
Loan Officer
Movement Mortgage
NMLS ID # 2236478

575 Lynnhaven Pkwy, Ste 101, Virginia Beach, VA 23452
p: (757) 403-0814
e: grace.m.white@movement.com

56.     Specifically, White's acceptance of employment with Movement violates the express terms of the Confidentiality Agreement's one (1) year noncompete clause that prevents White from working in a competitive capacity within the Restricted Area.  In fact, White appears to be doing roughly the same work for Movement that she did for Southern Trust.

57.     Movement competes with Southern Trust in the twelve (12) states in which Southern Trust operates and holds itself out online as having "pioneered a unique approach to home loans centered around helping homebuyers, quickly and easily." Just like Southern Trust,

Movement is in the mortgage industry, which is clearly defined as a "Competitive Business" in the Confidentiality Agreement. *See,* Exhibit B ¶ 8.

58.    Additionally, White's title as a "Loan Officer" indicates that she is providing products and services that are "competitive with products and/or services provided by [White] on behalf of [Southern Trust]" when she resigned.

59.    White works out of Movement's Virginia Beach office located at 575 Lynnhaven Pkwy, Ste 101, Virginia Beach, Virginia 23452, which is only *4.5 miles* from the office where White worked as a Loan Officer on behalf of Southern Trust.

60.    The distance between Movement's and Southern Trust's locations expressly violates the noncompete clause of the Confidentiality Agreement, and more specifically, the term "Restricted Area," which is defined as a 25-mile radius from any office where Loan Officer worked on behalf of Company" from any office where Loan Officer worked on behalf of Company within twelve (12) months prior to cessation of employment. *See,* Exhibit B, ¶ 8.

### *White Violated Her Fiduciary Duties and Her Contractual Obligations*

61.    After White resigned her employment with Southern Trust, the Company reviewed her company email account. Southern Trust's investigation revealed that White actively solicited at least seven (7) Southern Trust prospects and/or customers to apply for loans at her new employer, Movement, while she was still employed by, and accepting a salary from, Southern Trust.

62.    Brazenly, White sent these emails from her ***Southern Trust email address*** while she was still working at Southern Trust to at least six Southern Trust customers.

63.    Several of these customers had active loans with Southern Trust, and in the case where the customer was still shopping for a home, that customer constituted a lead that an officer

at Southern Trust had already pre-qualified for a mortgage loan. In some instances, White withheld the customer lead from Southern Trust and instead directed the prospective customer to apply with Movement. In doing so, White deprived Southern Trust of the ability to work those leads.

64.     Each of the emails contained approximately the same language. Below is an excerpt from an email sent to customer at 9:38 AM, October 16, 2024, the day White resigned. A true and correct copy of the email to Customer 1 from White is attached hereto as **Exhibit C**.

From:       Grace White
To:         ▮▮▮▮▮▮▮▮▮▮▮
Subject:    loan app with new company

HI ▮▮▮▮ ,
It was good speaking with you this morning. I would like to get your application moved over to the new company, Movement Mortgage. Would you please complete the application with the link below. This will go to my team lead until I get set up with them in the next couple of days.

https://apply.movement.com/#/milestones?referrerId=reggie%40movement.com

Reggie Register is the name of the loan officer that will be taking the application and is aware that I am sending you over. Don't worry about any documents because I have them saved will upload them to your new application. I appreciate your understanding and flexibility.

Kind regards,

65.     In the emails, White directed the customers to apply via a link she included for loans at her "new company" to get the customer's loan application moved over to Movement while she "get[s] set up with [Movement] in the next couple of days."

66.     White informed the customers that Reggie Register, a loan officer at Movement, would be taking the application and "***is aware that I am sending you over***." *See,* Exhibit C (emphasis added). White also assured the customers not to "worry about any documents because I have them saved and will upload them to your new application." *Id.*

16

67. Unsurprisingly, Southern Trust later discovered that White had in fact downloaded customer files from her Southern Trust computer onto an external USB drive while she was still working for Southern Trust, and retained that drive (and the Confidential Information and trade secrets contained within) after she resigned.

68. White returned the thumb drive after Southern Trust flagged this issue for Movement. Upon review of the thumb drive, Southern Trust determined that there were 5,109 total files on the thumb drive, including confidential documents on loan programs, training materials, appraisals, custom forms, templates, marketing materials, Southern Trust's income calculator for self-employed borrowers, and White's customer leads.

69. As evidenced by the contents of her returned thumb drive, White took screenshots to exfiltrate information from Southern Trust where Southern Trust's systems blocked printing or downloading, indicating that she was sophisticated and intentional in her actions.

70. Many of the contents of the thumb drive represent nonpublic, sensitive customer information that is commercially valuable to Southern Trust and that it expends significant effort in maintaining secrecy.

71. When she signed the Employment Agreement, White agreed during her employment to work exclusively for Southern Trust and "no other employer, lender, broker, or other entity, and shall not engage in any way in any mortgage lending or brokering, loan processing or underwriting services…" unless approved by Southern Trust. *See,* Exhibit A, Art. II 2.1(c). White also agreed in the Confidentiality Agreement not to disclose Southern Trust's Confidential Information or use it not for the benefit of the Company. *See,* Exhibit B at ¶ 3.

72. Based on White's statements in her customer solicitation emails, and upon information and belief, White clearly breached these obligations. White's comments and actions,

17

along with the actions of Mr. Register and Movement, demonstrate White's clear intent to use Southern Trust's Confidential Information and trade secrets to unfairly compete with Southern Trust.

73. Specifically, White worked for a competitor while employed by Southern Trust by soliciting current and potential Southern Trust customers to discontinue doing business with Southern Trust and instead conduct business with Movement.

74. In furtherance of this purpose, upon information and belief, White diverted customers to Movement and retained Confidential Information and trade secrets for use and/or disclosure on behalf of Movement.

75. Upon information and belief, White, while still employed at Southern Trust, and with the help of Mr. Register, diverted at least three loan applications from Southern Trust to Movement. In fact, at least one of the customers informed the Virginia Beach office's branch manager that the customer applied for a loan "at Grace's new company."

76. These are lost loans that Southern Trust would have otherwise had the opportunity to underwrite and close but for the interference by the Defendants.

77. White diverted borrowers who applied and/or inquired about a mortgage through Southern Trust and prospective leads by taking non-public information provided to Southern Trust by borrowers and without their consent or that of Southern Trust. Mr. Register could then use this information to prepare loan estimates, applications, and process loans for those borrowers using the information supplied to Southern Trust for the purpose of obtaining a loan through Southern Trust. But for White's actions and improper concealment of Southern Trust's leads, it is possible that those customers would otherwise have applied with Southern Trust.

18

78. In doing so, White also violated the Secure and Fair Enforcement of Mortgage Licensing Act, which (1) provides that each loan originator must conspicuously disclose the licensed entity for whom they work and (2) that a loan officer may not simultaneously work for two different licensed entities simultaneously. The purpose of this Act is to prevent borrower confusion and improve transparency to ensure that a borrower know exactly which entity is responsible for arranging or providing the financing for their home as well as the identity of the entity being supplied their private nonpublic information. Transparency is critical so borrowers can hold the appropriate persons accountable in the event of any improper or unlawful activities.

79. The disclosure of this information violated White's contractual and legal obligations to Southern Trust and also amounts to violations of the Gramm Leach Bliley Act, which prohibits the transfer of customer data without a customer's consent, particularly where the transfer is accomplished through unsecure means.

80. Upon information and belief, Mr. Register and Movement were aware that the applications received from White's customers were currently customers of Southern Trust at the time, thus the information received from White was the Confidential Information of Southern Trust.

81. At all times relevant to this action, Movement knew by virtue of White's licensing status contained within the National Mortgage Licensing System ("NMLS") that White, acting in concert with Mr. Register, a Movement employee, was engaging in conduct that violated the terms of her employment with Southern Trust and in violation of federal lending and privacy laws.

82. Once Southern Trust became aware of White's theft and deception, on October 18, 2024, Southern Trust's counsel sent cease and desist letters to both White and Movement

reminding them of White's contractual obligations. True and correct copies of these letters are attached as **Exhibit D**.

83.     Despite these reminders, it appears that White is still contacting Southern Trust's customers while she is working for Movement.

84.     Specifically, on October 23, 2024, a Southern Trust customer, who was pre-qualified for a loan with Southern Trust, emailed White at her Southern Trust email address responding to a communication from White.

85.     Upon information and belief, White contacted this customer after she resigned from Southern Trust and during her employment with Movement to solicit her to apply for a mortgage with Movement instead of with Southern Trust.

86.     Furthermore, White's employment with Movement requires her to further violate her Confidentiality Agreement with Southern Trust by working on matters she cannot reasonably perform without relying on the experience gained from enrolling in the Program in her employment with Southern Trust.

87.     As detailed above, during White's employment with Southern Trust, she garnered extensive knowledge of Southern Trust's proprietary information through the Program consisting of invaluable marketing strategies, innovative sales techniques and cultivating relationships with borrowers and realtors.

88.     Southern Trust invested tens of thousands of dollars and hundreds of man hours training White and cultivating a market specifically for her with Virginia realtors all premised on the promises contained in the Employment and Confidentiality Agreements.

89.     Moreover, through her employment as a Loan Officer, White also obtained access to Southern Trust's Confidential Information and trade secrets.

90.     Therefore, even if White were inclined to live up to her obligation under the Confidentiality Agreement, her employment with Movement would inevitably lead to impermissible use of Southern Trust's propriety information, which includes unique teaching methods of developing and maintaining business relations in the mortgage industry as a Loan Originator.

91.     Defendants' actions, when taken together, reveal the intention, scope, and purpose of Defendants' scheme: to compete with Southern Trust by using Southern Trust's Confidential Information and trade secrets to aggressively solicit and divert Southern Trust's business from customers and potential customers over which White, in her position as a Loan Officer, had direct responsibility.

92.     The unlawful conduct detailed above has damaged Southern Trust, causing the loss of potential customers, and, generally, lost profits due to lost business and potential business.

93.     As a result of the above actions Southern Trust has suffered and continues to suffer irreparable injury and damages.

## <u>FIRST CAUSE OF ACTION</u>
### Breach of Contract
### (Against Defendant White)

94.     Southern Trust incorporates all previous paragraphs as if fully set forth herein.

95.     White entered into an Employment Agreement and Confidentiality Agreement with Southern Trust as consideration for the commencement of her employment with Southern Trust. Southern Trust has satisfied all of its obligations under the Employment Agreement and Confidentiality Agreement.

96.     Under the terms of the Employment Agreement, White acknowledged that she would assist and work for only Southern Trust and no other employer, lender, broker, or other

entity, and shall not engage in any way in any mortgage lending or brokering, loan processing or underwriting services while employed with Southern Trust. *See,* ¶ 25, citing Exhibit A, Art. II 2.1. Notwithstanding this provision and while still in Southern Trust's employ, White diverted potential customers and customers to another employer and lender, Movement, in violation of her Employment Agreement. *See,* ¶¶ 62-67, 73-78.

97. Further, as part of the Confidentiality Agreement, White agreed that the Confidential Information she received during her employment with Southern Trust remained Southern Trust's property, and that she was to promptly return the information upon her termination. White also agreed that she would not disclose Southern Trust's Confidential Information to any other person, firm or entity or use, or allow others to use, the Confidential Information for purposes other than Southern Trust's business. *See,* ¶¶ 30-31, citing Exhibit B at ¶¶ 3-4.

98. White breached her obligations under the Confidentiality Agreement by, among other things, downloading Southern Trust's confidential and proprietary information to an external USB drive without authorization and, upon information and belief, using and/or disclosing this information to Mr. Register, an agent of Movement, without legal justification or excuse and during the Confidentiality Period. *See* ¶¶ 68-71, 78, 80-81.

99. Moreover, White breached the Non-Solicitation Provisions of the Confidentiality Agreement by soliciting or attempting to solicit Southern Trust's customer and potential customers for whom White provided services within one (1) year of the end of White's employment with Southern Trust. *See* ¶¶ 62-67.

100. In addition to the foregoing, under the terms of the Confidentiality Agreement, White acknowledged that for a "period of twelve (12) months following the cessation of Loan

Officer's employment for whatever reason, with or without cause, Loan Officer shall not, on Loan Officer's own behalf or on behalf of any other person or entity, compete with Company in the Restricted Area by engaging, in a competitive capacity, in any Competitive Business…" *See*, Exhibit B, ¶ 8.

101. Notwithstanding this provision, White traveled only 4.5 miles away from her Southern Trust office in Virginia Breach to work for Movement, a direct competitor, one day after resigning from Southern Trust, in violation of Paragraph 8 of her Confidentiality Agreement. *See*, Paragraph ¶¶ 60.

102. Upon information and belief, in her role as a Loan Officer for Movement, White is serving the same customers and providing the same loan services that she personally served while employed with Southern Trust and that were largely developed for her by Southern Trust.

103. White continues to breach the Confidentiality Agreement by continuing her employment at Movement in violation of the one (1) year noncompete.

104. White is misappropriating Southern Trust's investment in the form of money and manhours by competing in the very market developed for her by Southern Trust based upon the promise that she would not divert this investment to a competitor.

105. By engaging in the misconduct and other wrongful acts set forth above, White materially breached her agreements with Southern Trust.

106. The Non-Compete Covenant, Customer and Potential Customer Non-solicitation Covenants, and the Covenant Not to Divulge Company Confidential Information provide reasonable protection to Southern Trust's legitimate business interest in both duration and geographic scope.

107.    As a proximate result of White breaching her contractual obligations, Southern Trust has suffered and continues to suffer damages in the form of monetary losses.

108.    The Confidentiality Agreement also requires White to pay Southern Trust's "reasonable attorney fees" if the Court finds that White breached any provisions of her Employment Agreement. *See* Exhibit B, ¶ 28.

109.    Similarly, the Employment Agreement provides that White will reimburse Southern Trust the costs and expenses of litigation, including "reasonable attorney fees" if Southern Trust purposes any action at law or equity to enforce the Employment Agreement and "substantially prevails." *See* Exhibit A, Art. IX ¶ 9.12.

110.    The harm suffered by Southern Trust from White's breach of the Employment and Confidentiality Agreements is continuing and cannot be compensated by money damages alone. Accordingly, Southern Trust is entitled to injunctive relief in addition to compensatory damages.

## SECOND CAUSE OF ACTION
### Violation of the Defend Trade Secrets Act, 18 U.S.C. § 1831 *et. seq.*
### (Against Defendant White)

111.    Southern Trust incorporates all previous paragraphs as if fully set forth herein.

112.    The materials on the USB drive taken by White for use at Movement constitute trade secrets of Southern Trust subject to protection under the Defend Trade Secrets Act ("DTSA"), 18 U.S.C. § 1831 *et seq*.

113.    The DTSA prohibits the misappropriation of trade secrets.

114.    The DTSA defines "trade secret" as "all forms and types of financial, business…information…whether tangible or intangible, and whether or how stored, compiled, or memorialized physically, electronically, graphically, photographically, or in writing if - (A) the owner thereof has taken reasonable measures to keep such information secret; and (B) the

information derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable through proper means by, another person who can obtain economic value from the disclosure or use of the information."

115. The DTSA defines "misappropriation" in part as "(A) acquisition of a trade secret of another by a person who knows or has reason to know that the trade secret was acquired by improper means; or (B) disclosure or use of a trade secret of another without express or implied consent by a person who- (i) used improper means to acquire knowledge of the trade secret; (ii) at the time of disclosure or use, knew or had reason to know that the knowledge of the trade secret was…(I) derived from….a person who had used improper means to acquire the trade secret; (II) acquired under circumstances giving rise to a duty to maintain the secrecy of the trade secret or limit the use of the trade secret; or (III) derived from or through a person who owed a duty to the person seeking relief to maintain the secrecy of the trade secret or limit the use of the trade secret…"

116. Pursuant to the DTSA, the trade secret must also be related to a product or service used in, or intended for use in, interstate or foreign commerce.

117. As a mortgage lender, Southern Trust obtains and stores substantial amounts of nonpublic, sensitive customer information that it does not share with its competitors, including but not limited to names, address, employment information, social security numbers, salary information, credit information, credit card and bank account numbers, assets, liabilities, loan approval, loan status and loan denial, credit scores, account balances and other financial information for the purposes of providing mortgage lending services to its customers.

118.     Southern Trust also derives independent economic value from its prospective and current customer lists, loan applications, pricing information, and communications with clients, as those categories of information are essential to the operation of its business.

119.     Southern Trust develops its prospective and current customer lists by expending significant resources. To ensure the protection of Southern Trust's confidential and proprietary information, Southern Trust takes several steps to maintain the privacy of its data and information. For instance, Southern Trust's email and loan operating systems are password protected and encrypted, and in order for employees to access the systems, a Technical Administrator of Southern Trust's IT Department has to provide permission. Southern Trust's system also has user level permissions, which requires access by a Technical Administrator of Southern Trust's IT Department. Finally, Southern Trust used two-factor authentication, which provided a second layer of protection to their system. Southern Trust also requires some of its Loan Officers to sign Confidentiality Agreements to prevent the unauthorized disclosure and/or use of its Confidential Information and its trade secrets, and issues cease and desist letters or engages in litigation to enforce these agreements. *See,* ¶¶ 12, 20, 30.

120.     Moreover, Southern Trust's trade secrets related to a product or service used in or intended for use in interstate commerce because the trade secrets are used by its Loan Officers across the nation to assist its customers with loan services.

121.     As such, prospective and current customer lists, loan applications, pricing information, and communications with clients constitute trade secrets under the DTSA.

122.     Southern Trust entrusted White with trade secret information in the performance of her job as a Loan Officer.

26

123.    White used improper means by moving Southern Trust's trade secrets onto an external USB drive. Specifically, she put 5,109 total files on a thumb drive, including confidential documents on loan programs, training materials, marketing materials, loan product offerings, appraisals, custom forms, Southern Trust's income calculator for self-employed borrowers, and White's customer leads. When she could not move certain files to the thumb drives, she took screenshots so that she could exfiltrate key information. She then took that thumb drive with her when she moved to Movement

124.    White likely used and/or disclosed (or plans to use and/or disclose) Southern Trust's trade secrets and other valuable business information contained in these files and data by improper means in violation of her contractual and other obligations to Southern Trust.

125.    White improperly, unlawfully, and maliciously (or in the alternative in bad faith) disclosed and/or used these trade secrets by providing this information to and/or utilizing this information on behalf of Movement after separating from her employment with Southern Trust.

126.    White engaged in this conduct despite acquiring this information under circumstances giving rise to a duty to maintain the information's secrecy and limit its use, which duty White owed and continues to owe Southern Trust.

127.    White's actions constitute an actual and threatened misappropriation and misuse of Southern Trust's trade secret information in violation of the DTSA.

128.    As a direct result of White's willful and malicious actions, Southern Trust was harmed and continues to be harmed.

129.    Pursuant to 18 U.S.C. § 1836, due to White's willful and malicious misappropriation, White is liable for Southern Trust's reasonable attorney's fees and exemplary damages.

130.    White caused Southern Trust's damages through lost customers and its good will.

**THIRD CAUSE OF ACTION**
**Violation of the Virginia Uniform Trade Secrets Act (Va. Code § 59.1-336)**
**(Against Defendant White)**

131.    Southern Trust incorporates all previous paragraphs as if fully set forth herein.

132.    The Virginia Uniform Trade Secrets Act, Va. Code § 59.1-336 ("VUTSA") prohibits the misappropriation of trade secrets.

133.    The VUTSA defines "trade secret" as "information, including but not limited to, a formula, pattern, compilation, program, device, method, technique, or process, that: (1) Derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable by proper means by, other persons who can obtain economic value from its disclosure or use, and (2) Is the subject of efforts that are reasonable under the circumstances to maintain its secrecy."

134.    Similar to the DTSA, the VUTSA defines misappropriation as the acquisition of a trade secret of another by a person who knows or has reason to know that the trade secret was acquired by improper means; or disclosure or use of a trade secret of another without express or implied consent by a person who either (a) used improper means to acquire knowledge of the trade secret…or knew or had reason to know that his knowledge of the trade secret was (1) derived from or through a person who had utilized improper means to acquire it; (2) acquired under circumstances giving rise to a duty to maintain its secrecy or limit its use; (3) derived from or through a person who owed a duty to the person seeking relief to maintain its secrecy or limit its use; or (4) acquired by accident or mistake.

135.    As a mortgage lender, Southern Trust obtains and stores substantial amounts of nonpublic, sensitive customer information that it does not share with its competitors, including but

28

not limited to names, address, employment information, social security numbers, salary information, credit information, credit card and bank account numbers, assets, liabilities, loan approval, loan status and loan denial, credit scores, account balances and other financial information for the purposes of providing mortgage lending services to its customers.

136.    Southern Trust also derives independent economic value from its prospective and current customer lists, loan applications, pricing information, and communications with clients.

137.    Southern Trust develops its prospective and current customer lists by expending significant resources. To ensure the protection of Southern Trust's confidential and proprietary information, Southern Trust takes several steps to maintain the privacy of its data and information. For instance, Southern Trust's email and loan operating systems are password protected and encrypted, and in order for employees to access the systems, a Technical Administrator of Southern Trust's IT Department has to provide permission. Southern Trust's system also has user level permissions, which requires access by a Technical Administrator of Southern Trust's IT Department. Finally, Southern Trust used two-factor authentication, which provided a second layer of protection to their system. Southern Trust also requires some of its Loan Officers to sign Confidentiality Agreements to prevent the unauthorized disclosure and/or use of its Confidential Information and its trade secrets, and issues cease and desist letters or engages in litigation to enforce these agreements. *See,* ¶¶ 12, 20, 30.

138.    As such, prospective and current customer lists, loan applications, loan product offerings, pricing information, and communications with clients constitute trade secrets under the VUTSA.

139.    Southern Trust entrusted White with trade secret information in the performance of her job as a Loan Officer.

29

140. White used improper means by moving Southern Trust's trade secrets onto an external USB drive. Specifically, she put 5,109 total files on a thumb drive, including confidential documents on loan programs, training materials, appraisals, custom forms, Southern Trust's income calculator for self-employed borrowers, and White's customer leads. When she could not move certain files to the thumb drives, she took screenshots so that she could exfiltrate key information. She then took that thumb drive with her when she moved to Movement

141. White improperly, unlawfully and maliciously (or in the alternative in bad faith) disclosed and/or used these trade secrets by providing this information to and/or utilizing this information on behalf of Movement after separating from her employment with Southern Trust.

142. White engaged in this conduct despite acquiring this information under circumstances giving rise to a duty to maintain the information's secrecy and limit its use, which duty White owed and continues to owe Southern Trust.

143. As a direct result of White's willful and malicious actions, Southern Trust was harmed and continues to be harmed.

144. Pursuant to Va. Code §§ 59.1-338 and 59.1-338.1, due to White's willful and malicious misappropriation, White is liable for Southern Trust's reasonable attorney's fees and exemplary damages.

145. White caused Southern Trust's damages through lost customers and its good will.

## FOURTH CAUSE OF ACTION
### Breach of Fiduciary Duty
### (Against Defendant White)

146. Southern Trust incorporates all previous paragraphs as if fully set forth herein.

147. During the time White worked for Southern Trust, she owed Southern Trust a fiduciary duty of loyalty. This duty requires White to act with the utmost good faith and loyalty

30

towards Southern Trust and to avoid actively competing with and against Southern Trust while employed by Southern Trust.

148. White breached her fiduciary duties, statutory duties, as well as her duty of loyalty to Southern Trust by secretly diverting Southern Trust's borrowers to Movement, misappropriating Southern Trust's Confidential Information and trade secrets, and by converting and disclosing confidential borrower information to solicit, either directly or indirectly, Southern Trust's borrowers away from Southern Trust and towards Movement, one of Southern Trust's competitors. *See* ¶¶ 30-31, 62-67, 73-78, 81-94.

149. In acting in the manner described herein, White used her position of trust and confidence to further her own interests in violation of her duty to work solely in the best interest of Southern Trust while she remained a Southern Trust employee, receiving compensation from Southern Trust.

150. As a result of White's wrongful conduct, Southern Trust has suffered and continues to suffer economic loss, and other general and specific damages, including, but not limited to, damage to business reputation, lost revenue, and lost business opportunities. Additionally, White should be required to disgorge all compensation paid to her for her period of disloyalty.

## FIFTH CAUSE OF ACTION
### Aiding and Abetting Breach of Fiduciary Duty
### (Against Defendant Movement)

151. Southern Trust incorporates all previous paragraphs as if fully set forth herein.

152. The elements of a claim for aiding and abetting a breach of fiduciary duty are that Defendant: (1) knows that another's conduct constitutes a breach of duty and (2) gives substantial assistance or encouragement to a person engaging in such conduct. *See* Restatement (Second) of Torts § 876 (1979). *See also Halifax Corp. v. Wachovia Bank*, 268 Va. 641, (2004) (establishing

31

the elements of the tort to include both knowledge that another breached a duty and that the defendant "somehow recruited, enticed, or participated" in the breach).

153.   Movement aided and abetted White's breach of fiduciary duty by participating in the diversion of Southern Trust's customers for the use and benefit of Movement, as evidenced by Register's collaboration with White in her solicitation of Southern Trust clients and/or prospects on behalf of Movement while she was employed by Southern Trust. *See* ¶¶ 62-67, 73-78, 81-94.

154.   Register was acting as an agent of Movement when he collaborated with White.

155.   In doing the acts alleged herein, Movement acted with oppression, fraud, malice and in conscious disregard of Southern Trust's rights, and Southern Trust is therefore entitled to punitive damages in an amount according to proof at trial.

## SIXTH CAUSE OF ACTION
### Tortious Interference with Prospective Business Relationships
### (Against Defendants)

156.   Southern Trust incorporates all previous paragraphs as if fully set forth herein.

157.   The elements of tortious interference with prospective business advantages and relationships are (1) the existence of a valid business expectancy with a probability of a future economic profit; (2) Defendant's knowledge of the expectancy; (3) a reasonable certainty that absent Defendant's misconduct, the plaintiff would have realized the expectancy; and (4) damage to the plaintiff.

158.   Southern Trust had a reasonable expectancy that it would receive business from White in her role as a Loan Officer. In White's capacity as a Loan Officer, it was expected that she would build rapport with customers, develop relationships with real estate agents and grow Southern Trust's revenues.

159. There was a reasonable probability of economic benefit to Southern Trust from White's role in the company. Defendants knew that Southern Trust expected to benefit from all business that came to Southern Trust and all transactions that White oversaw in her role as a Loan Officer for Southern Trust.

160. Defendants intentionally and tortiously interfered with Southern Trust's business relationships with its prospective customers by scheming to divert customers from Southern Trust to Movement.

161. Upon information and belief, absent Defendants' intentional misconduct, Southern Trust would have continued in the business relationships with these prospective customers and would have realized its expectancy of business and economic gain from these relationships.

162. Defendants' interference with Southern Trust's customer relationships was intentional because White and Movement were fully aware that these customers had existing relationships with Southern Trust and took active steps to interfere with these relationships by working for the benefit of a direct competitor of Southern Trust.

163. As a consequence, and proximate result of the tortious interference by Defendants, Southern Trust has suffered, and continues to suffer, economic loss and other general and specific damages, including, but not limited to damage to business reputation, lost profits, lost revenue, and lost business opportunities.

164. Upon information and belief, the acts of Defendants were willful and malicious, and done with a wanton disregard for Southern Trust's rights, such that Southern Trust has suffered oppression and lost customers of which Defendants were well aware. Accordingly, Southern Trust is entitled to punitive damages, in an amount to be proved at trial.

**SEVENTH CAUSE OF ACTION**
**Statutory Conspiracy V.A. Code § 18.2-500**
**(Against All Defendants)**

165.    Southern Trust incorporates all previous paragraphs as if fully set forth herein.

166.    V.A. Code § 18.2-499 imposes liability on "any two or more persons who combine, associate, agree, mutually undertake or concert together for the purpose of (i) willfully and maliciously injuring another in his reputation, trade, business, or profession by any means whatever or (ii) willfully and maliciously compelling another to do or perform any act against his will, or preventing or hindering another from doing or performing any lawful act."

167.    As set forth above, Defendants acted together, in concert and/or confederated with one another by agreement or understanding, to commit one or more of the improper and unlawful acts described in this Complaint, including breaching fiduciary duties relating to Southern Trust. *See* ¶¶ 62-67, 73-78, 81-94.

168.    White and Movement had an agreement, express or implied, to undertake the acts of solicitation, breaching White's fiduciary duties, and tortiously interfering with Southern Trust's business in an effort to injure Southern Trust and to benefit Defendants.

169.    Upon information and belief, the Defendants formed a combination of two or more persons, and entered into a conspiracy for the purpose of using Southern Trust's Confidential Information and trade secrets, including but not limited to Southern Trust's customer contacts, clients, and pricing information to establish a competing entity against Southern Trust to benefit their own economic advantage and cause loss and damage to Southern Trust.

170.    The activities detailed in the Complaint and taken by Defendants constitutes overt acts taken in furtherance of the conspiracy. *See* ¶¶ 67, 73, 76, 78, 81-82.

171.    Defendants are jointly and severally liable for each other's wrongful acts done in furtherance of the conspiracy. *See* ¶¶ 67, 73, 76, 78, 81-82.

172.    As a direct and proximate result of Defendants' improper, unlawful, willful, and malicious conduct, Southern Trust has suffered and will continue to suffer, competitive harm, irreparable injury, and significant damages, in an amount to be proven at trial.

## EIGHTH CAUSE OF ACTION
### Civil Conspiracy
### (Against All Defendants)

173.    Southern Trust incorporates all previous paragraphs as if fully set forth herein.

174.    The elements of common law conspiracy are set forth as: a combination of two or more persons; to accomplish, by some concerted action; some criminal or unlawful purpose or some lawful purpose by a criminal or unlawful means; and resultant damage caused by the defendant's acts committed in furtherance of the conspiracy.

175.    Defendants combined, associated, agreed, mutually undertook, concerted together and/or otherwise conspired with each other to knowingly, willfully, maliciously to violate White's fiduciary duty and contractual obligations by diverting or acting to diminish the business relationship between Southern Trust and its customers. *See* ¶¶ 67, 73, 76, 78, 81-82.

176.    Upon information and belief, Defendants acted in furtherance of a conspiracy both before and after Defendant White terminated her relationship with Southern Trust.

177.    Defendants' actions were intentional, without legal justification, and made in concert with one another for the unlawful purpose of interfering with the Employment and Confidentiality Agreements to injure Southern Trust in its business, reputation, and trade and have caused Southern Trust to suffer damages in an amount to be proven at trial.

35

## **PRAYER FOR RELIEF**

**WHEREFORE**, as to all counts and Defendants, Southern Trust respectfully requests that the Court enter judgment in its favor and award the following relief against Defendants:

A.  That Southern Trust be awarded compensatory damages in an amount to be determined at trial;

B.  That Southern Trust be awarded its actual and consequential damages according to proof at trial;

C.  That Southern Trust be awarded treble damages pursuant to V.A. Code § 18.2-500;

D.  That Southern Trust be awarded punitive damages as permitted by law;

E.  That Southern Trust be awarded prejudgment interest to the fullest extent available under applicable law;

F.  That Southern Trust be awarded reasonable attorneys' fees and costs to the fullest extent available under applicable law;

G.  That Southern Trust be awarded such other injunctive and provisional remedies, as appropriate, as well as an accounting to the fullest extent available under applicable law; and

H.  That Southern Trust be granted such other and further relief as the Court deems just and proper.

Dated: November 4, 2024.

Respectfully submitted,

*/s/Theresa Connolly*
Theresa Connolly
Virginia Bar No. 46583
**FISHER PHILLIPS LLP**
2011 Crystal Drive, Suite 400
Arlington, Virginia 22201
Phone: (703) 682-7095
tconnolly@fisherphillips.com

Michael P. Elkon (motion for admission *pro hac vice* forthcoming)
Georgia Bar No. 243355
**FISHER & PHILLIPS LLP**
1230 Peachtree Street, NE
Suite 3300
Atlanta, Georgia 30309
Phone (404) 231-1400
Facsimile (404) 240-4249
melkon@fisherphillips.com

*Attorneys for Plaintiff*
*Southern Trust Mortgage, LLC*

37